IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRUCE CAMPBELL,                    :    CIVIL ACTION
Administrator of the estate of     :
GREGORY C. CAMPBELL                :
                                   :
            v.                     :
                                   :
CITY OF PHILADELPHIA, et al.       :    NO. 07-3226

MEMORANDUM

Dalzell, J.                                    February 26, 2013

        Bruce Campbell, as Administrator for the estate of his
son, Gregory C. Campbell (hereinafter "Campbell"), brings this
action against defendant police officers and the City of
Philadelphia for violations of 42 U.S.C. § 1983.  The suit
arises out of an incident in August of 2006 when Philadelphia
Police Officers Frank Luca and William Schlosser shot and killed
Campbell.[1]

        Plaintiff initially brought this action in seven
counts, and the defendants moved for summary judgment on all of
them.  Plaintiff now concedes that Count I -- with respect to
defendant Officers Crown, Trask, and Williams, and Counts II,
III, V, VI, and VII -- should be dismissed.  Thus, we consider
here the summary judgment motion with regard to Count I -- which
alleges that defendant police officers Luca and Schlosser

_____

[1] This case was transferred to our docket from the docket of our
late colleague, Judge Pollak.

violated Campbell's rights under the Fourth and Fourteenth Amendments to be free from unreasonable force in violation of 42 U.S.C. § 1983 -- and Count IV -- a claim under § 1983 against the City of Philadelphia for failure to train, supervise, and discipline the defendant police officers. We exercise jurisdiction pursuant to 28 U.S.C. § 1331.

The factual background on which Count I depends is limited to the events of August 21, 2006. The underpinnings of Count IV, on the other hand, involve the training police officers receive regarding traffic stops, and, according to plaintiff, the degree to which the officers complied with that training. For clarity's sake, we will consider each factual background separately in the context of each claim.

I.    Standard of Review

A party moving for summary judgment bears the initial burden of informing the district court of the basis for its argument that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact", Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets this initial burden, Fed. R. Civ. P. 56 then obliges "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324.

A factual dispute is genuine

> [I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party. . . . The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law". Id. at 248.

We "must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000), cited in Amour v. County of Beaver, PA, 271 F.3d 417, 420 (3d Cir. 2001)).

Moreover, as our Court of Appeals has cautioned,

> a court should not prevent a case from reaching a jury simply because the court favors one of several reasonable views of the evidence. "[T]he judge's function is not himself to weigh the evidence and

> determine the truth of the matter but to
> determine whether there is a genuine issue
> for trial."

Abraham v. Raso, 183 F.2d 279, 287 (3d Cir. 1999) (quoting

Anderson, 477 U.S. at 249) (alteration in original).


II.     Count I - Excessive Use Of Force By Officers Schlosser
        And Luca In Violation Of 42 U.S.C. § 1983, Brought
        Against Those Defendants In Their Individual Capacities

        Plaintiff alleges that defendants Luca and Schlosser

violated Campbell's Fourth Amendment right to be free from

unreasonable seizure when they used deadly force against him,

ultimately causing his death.  Pl. Resp. at 27-28.[2]  The

defendants argue that they are not liable because the use of

force was justified, Def. MSJ 24-26, and they contend that even

if we hold that their conduct did violate Campbell's rights

under the Fourth Amendment, they are nevertheless entitled to

qualified immunity.  Def. MSJ 26.

--------

[2] Plaintiff's complaint alleges that the shooting violated
Campbell's rights under the Fourth Amendment and the Fourteenth
Amendment, in violation of § 1983.  Comp. ¶¶ 22-24.  In his
response, the plaintiff appears (wisely) to have abandoned the
argument that the conduct violated the Fourteenth Amendment.  As
the Supreme Court has made clear, excessive force claims in "the
context of an arrest or investigatory stop of a free citizen"
should be analyzed solely under the Fourth Amendment and not
under the Fourteenth Amendment.  Graham v. Connor, 490 U.S. 386,
394-95 (1986).  We will thus analyze plaintiff's excessive force
claim by considering whether he has identified a genuine issue
of material fact as to whether defendants violated Campbell's
Fourth Amendment rights.

4

A.    Factual Background

1.    Undisputed Facts

The parties agree about the facts that led to the confrontation in which Campbell was killed.

On the evening of August 21, 2006, Suzanne Snyder drove her mother's silver Acura to Campbell's parents' house in Kennett Square, Pennsylvania.  Def. MSJ Ex. A ¶ 1, Pl. Resp. at 3.  Campbell and Snyder planned to go to dinner on South Street in Philadelphia.  After Snyder picked Campbell up, she asked him to drive, and he obliged.  Def. MSJ Ex. A ¶¶ 2-3, Pl. Resp. at 3.

Campbell drove north on Interstate 95 into Philadelphia.  He told Snyder that he was upset because he had been fighting with his parents and had broken up with his girlfriend.  As they drove, Campbell began to flirt with Snyder and made unwanted advances toward her.  Snyder became upset.  As Campbell and Snyder argued, Campbell exited I-95 and entered the neighborhood of Port Richmond.  He began speeding and drove through a red light.  Def. MSJ Ex. A ¶¶ 4-8, Pl. Resp. at 3. Snyder told Campbell she wanted to get out of the car.  Def. MSJ Ex. A ¶ 8, Pl. Resp. at 3.

Campbell pulled the car into the parking lot of an
Arby's restaurant at 2500 Aramingo Avenue in Philadelphia.
Snyder got out and went into the Arby's, and when she returned
the car was gone.  Def. MSJ Ex. A ¶¶ 9-11, Pl. Resp. at 3.

While Snyder was in the restaurant, Campbell had
pulled out of the parking lot and driven north on Aramingo
Avenue where he rear-ended a white 1996 BMW that was stopped at
a red light, seriously injuring the driver and passenger.  John
Fetzer, an off-duty police officer with the United States
Department of Defense, saw the accident and approached to see if
he could help.  Def. MSJ Ex. A ¶¶ 14-17, Pl. Resp. at 3.  As
Fetzer walked up, Campbell drove off, nearly striking Fetzer,
and the BMW gave chase.  A third driver followed on a
motorcycle.  Fetzer got into his car and tried to follow, but he
could not keep up.  Def. MSJ Ex. A ¶¶ 18-21, Pl. Resp. at 3.

The Philadelphia Police Radio received two calls --
one at 7:54:15 p.m. and the other at 7:54:25 p.m. -- reporting
the chase.  The first caller said that she saw a silver car, a
white car, and a man on a motorcycle speeding down Richmond
Street, and the second caller said that she saw three cars and a
motorcycle "driving like crazy" on Ontario Street toward
Richmond Street.  Def. MSJ Ex. A ¶¶ 22-23, Pl. Resp. at 3.

Two police officers, Carlos Cortes and Stephanie
Flanders, who were nearby in a marked police wagon, also
observed the Acura and the BMW speeding while heading east on
Ontario Street.[3]  After seeing the cars disregard a four-way stop
sign at the intersection of Ontario and Salmon Streets, the
officers notified Police Radio and began following the cars.
Def. MSJ Ex. A ¶¶ 22-24, Pl. Resp. at 3.

At the intersection of Edgemont Street and Allegheny
Avenue all the cars stopped at a red light, and the BMW pulled
to the curb.  Officers Cortes and Flanders pulled up behind the
Acura and Flanders got out of the police car.  As she approached
the vehicle, the traffic light turned green and Campbell began
to drive away.  As he tried to get around traffic on Edgemont
Street, Campbell swung to the right and almost struck Flanders.
Def. MSJ Ex. A ¶¶ 24-29, Pl. Resp. at 3.

Cortes continued to follow Campbell as he headed east
on Allegheny Avenue toward Delaware Avenue.  At the intersection
of Allegheny Avenue and Richmond Street Cortes pulled up behind
the Acura and signalled Campbell to pull over.  Campbell then

---

[3] At 7:59:01 p.m., 7:59:05 p.m., and 7:59:10 p.m., the
Philadelphia Police Radio received three different calls from
female callers saying that the man on the motorcycle had fallen
off at Richmond Street and Castor Avenue.  Def. MSJ Ex. A ¶ 38,
Pl. Resp. at 3.

ran a red light to avoid Cortes, and Cortes followed him onto Delaware Avenue. At this point, a police supervisor ordered Cortes to stop the pursuit, and a police helicopter, "TacAir 1", began to monitor the Acura. Def. MSJ Ex. A ¶¶ 24, 30-33, Pl. Resp. at 3.

TacAir 1 observed the Acura driving erratically -- going the wrong way on one-way streets, striking cars, and generally disregarding traffic controls. TacAir 1 was reporting the activity over the police radio throughout. Def. MSJ Ex. A ¶ 34, Pl. Resp. at 3.

At 7:58:36 p.m. the Philadelphia Police Radio received a call from an off-duty police officer saying that the police had stopped Campbell outside the off-duty officer's house at 3629 Thompson Street and that Campbell had again fled. The TacAir 1 observations confirmed this account. Def. MSJ Ex. A ¶¶ 35-36, Pl. Resp. at 3.

Police officers Michael Trask and James Crown were riding in a police car together when they saw Campbell speeding in the wrong direction on the 3500 block of Thompson Street. Trask moved the car to the left to avoid Campbell and then Campbell swerved, indicating that he was driving toward Trask

and Crown and forcing Trask to drive onto the sidewalk to avoid a collision. Def. MSJ Ex. A ¶ 37, Pl. Resp. at 3.

At 8:00:01 p.m. TacAir 1 broadcast over the police radio that the Acura was stuck in traffic on Belgrade Street heading toward Allegheny Avenue. Def. MSJ Ex. A ¶ 39, Pl. Resp. at 3.

The parties disagree about what followed.

## 2. Defendants' Statement Of Facts

The parties agree that as Campbell was sitting in traffic two uniformed police officers who had been in the area, Michael Wilson and Kathleen DeNofa, approached the car on foot. According to defendants, Wilson ordered Campbell to turn off the engine and get out of the car, but Campbell ignored him and continued to grip the steering wheel tightly. Def. MSJ Ex. A ¶ 40.

Meanwhile, the parties agree that another police car, in which Officers Luca and Costanza were riding, approached the scene and pulled onto the west sidewalk of Belgrade Street facing north, toward the Acura. Luca and Costanza parked, got out of their car, and walked past the front of their vehicle toward the Acura. Def. MSJ Ex. A ¶¶ 41, 43.

Defendants contend that as Wilson tried to remove Campbell from the Acura, Campbell moved the gearshift to reverse and the car began to back up.[4]  Defendants claim that Campbell then moved the gearshift into drive, turned the steering wheel to the right, and accelerated, causing the car to jump the curb. Campbell then drove forward onto the sidewalk where Luca stood. Def. MSJ Ex. A ¶ 42, 44-45.

The car then struck Luca, and, according to the defendants, it pinned him to the green wrought iron fence surrounding the church yard.  Def. MSJ Ex. A ¶ 46.  Luca drew his weapon and fired into the hood and windshield, striking Campbell.  Costanza and Schlosser drew their weapons and fired at the driver's side door of the Acura.  Def. MSJ Ex. A ¶ 47.

The parties agree that at 8:00:01 p.m. TacAir 1 broadcast, "Apprehension is gonna be made here in a second.  No injuries . . . ah no accidents to Police . . . Shots fired! Shots fired!"  Police Radio recorded that an officer was possibly shot.  Officer Luca responded on the radio that he was not shot but was pinned between the car and a fence.  Williams responded that he tried to remove Campbell from the Acura but

---

[4] The allegation that the car began to back up appears in defendants' "Statement of Undisputed Facts."  As we will discuss herein, the testimony of officers who witnessed the event differs on this point.

could not, so he walked around to the passenger's side, broke the window with his flashlight, and reached in to unlock the door.  Def. MSJ Ex. A ¶¶ 48 - 50.

Defendants contend that Officers Trask and Crown, who were monitoring the situation on the police radio, arrived at the scene as shots were being fired and ran to the Acura.  Trask and Crown say that they tried to remove Campbell from the car after he had been shot, but Campbell resisted so Trask punched him and Crown sprayed him with mace.  They then removed him from the Acura and put him in a police wagon for transport to the hospital.  Def. MSJ Ex. A ¶ 51.

Campbell and Luca were taken to Northeastern Hospital where Campbell died from multiple gunshot wounds.  Luca sustained injuries including a left tibial plateau fracture "consistent with a compression or impaction-type fracture", right knee cartilage injury, contusions to his abdomen, both legs, and hips and lumbar spine sprain and strain.  Def. MSJ Ex. A ¶ 55.

The Philadelphia Police Department investigated the incident, took photos of the scene of the shooting, and took statements from witnesses, including police officers and civilians.  Def. MSJ Ex. A ¶¶ 56-58.

3.    Plaintiff's Statement Of Facts

Plaintiff contends that the evidence establishes that Luca was not pinned to the fence at any time, including when the shooting started.  He also denies that the Acura was revving its engine, spinning its wheels, or accelerating at the time Luca and Schlosser shot Campbell.  Pl. Resp. at 28.  In support of these contentions, the plaintiff points to the physical evidence of the way the bullets entered the car and of Luca's injuries, as well as the inconsistent eyewitness testimony regarding how Luca was struck and how he was extricated.

Moreover, plaintiff contends that pervasive inconsistencies in the officers' eyewitness testimony and the physical evidence regarding Campbell's ability to resist arrest after he was shot, as well as when Trask and Crown punched him and sprayed him with mace after he was shot, all undermine the credibility of what the officers claim to have witnessed.

a.    Angle Of The Bullets Entering The Car

In support of the contention that Luca was not pinned to the fence but was moving, plaintiff asserts that Luca shot straight into the hood of the car from five to six feet in front of the car.  Pl. Resp. at 32.  Plaintiff points to the report of Dr. Albert B. Harper, the President of the Forensic Science

Consortium, Def. MSJ Ex. T.  Dr. Harper reviewed the

Philadelphia Police crime scene report and photographs, the

autopsy report and autopsy photographs of Campbell's wounds, as

well as examined the Acura itself.  Pl. Resp. at 29.

While studying the Acura, Dr. Harper inserted

trajectory rods into the twenty-two bullet holes in the hood,

windshield, and driver's side door.  Based on the trajectory of

one shot, Dr. Harper concluded that it was fired into the hood

from directly in front of the car.  He also opined that, "It is

not possible that Officer Luca was 'pinned' between the front of

the Acura and the wrought iron fence when this shot was fired."

Def. MSJ Ex. T. at 29.  To the contrary, Dr. Harper is of the

view that after Officer Luca fired the first shot from in front

of the car, he

> then moved to his left to a position on the
> side of the car somewhere near the front
> wheel well on the passenger side of the
> Acura and fired 17 additional shots.  The
> trajectory angles suggest that there are
> three separate clusters, but with only a
> small amount of movement from the shooter's
> right to left.  The distribution of shell
> casings also place Officer Luca on the
> passenger side of the car and not in front
> of the car when he fired the shots into the
> windshield.  Officer Luca was most likely
> some one to two feet from the left
> (passenger) side of the car when these shots
> were fired.

Id.

b.    Physical Evidence Of
Officer Luca's Injury

Dr. Harper also opines that Officer Luca was "injured and likely struck by the Acura," id. at 28, as evinced by the fracture of his left tibial plateau and the injury to his right knee.  Id.  But Dr. Harper maintains that "[t]here is no physical evidence that Officer Luca was pinned between the fence and the front of the automobile."  Id.

Plaintiff argues that "Luca[] exaggerated his injuries to bolster his claim that he [was] struck with great force by the car and pinned."  Pl. Resp. at 32.  Plaintiff notes that on the night of the accident Luca was taken to the emergency room where he was treated for cuts and contusions and he was discharged that night.  Medical Imaging Associates Report 09/12/06, cited in Report of Dr. Harper, Def. MSJ Ex. T at 11, see also Luca's Medical Records Review, Def. MSJ Ex. F at 2 ("X-rays of the right knee, left tibia/fibula and right hand were obtained, and all were interpreted to be unremarkable").  Dr. Harper notes that "upon subsequent follow-up MRI examination on 9/12/06, Officer Luca was diagnosed with '. . . a tiny subchondral fracture line along the anterior aspect of the ( left) lateral tibial plateau, with no significant depression",

Medical Imaging Associates Report 09/12/06, cited in Report of
Dr. Harper, Def. MSJ Ex. T at 11.  Dr. Harper observes that "[a]
fracture of the lateral tibial plateau is consistent with impact
trauma from being struck by the bumper of an automobile."
Report of Dr. Harper, Def. MSJ Ex. T at 11.

Plaintiff contends that notwithstanding Luca's
deposition testimony on February 12, 2009 -- when he testified
that "from [his] waist down [he was] just one gigantic black and
blue mark," Luca Dep., Def. MSJ Ex. M at 51:9-15 -- no
photographs of his injuries were ever taken.  Pl. Resp. at 22.
Furthermore, though Luca suggested in his testimony that he
received injuries to his kidneys as a result of the accident,
Luca Dep., Def. MSJ Ex. M at 22:21-23:19, the medical records
suggest that Luca had a history of kidney stones and that on the
day of the shooting he had cysts on his kidneys.  Luca Medical
Record Review, Def. Ex. F at 2.

> c.  Witnesses' Statements
>     Regarding How Officer Luca
>     Was Struck And How He Was Extricated

Plaintiff next contends that "[t]he contradictory
evidence about how [Luca] was struck and how he was actually
pinned corroborates the forensic evidence that he was not
pinned, particularly in light of the speed with which he became

unpinned", Pl. Resp. at 32, and, furthermore, "[t]he
contradictory versions of how Luca became unpinned, and the
quickness with which he was whisked away to the hospital support
the forensic testimony that he was never pinned". Id.

### 1. How Luca Was Struck

Luca testified that when he arrived at the corner of
Allegheny and Belgrade Streets he drove down the sidewalk and
stopped his car parallel to the fence facing Campbell's car,
Luca Dep., Def. Ex. M at 96:21-24. Luca then got out of the car
and walked past the front toward Campbell's Acura. Id. at
131:2-8. Luca testified that at the time he was experiencing
"tunnel vision" because his adrenaline was very high, causing
him to see only what was right in front of him. Id. at 131:23-
132:8. Luca saw the Acura stopped in traffic, and he testified
that he has no memory of seeing the car turn and accelerate, but
that he then felt the car touching him and noticed that it was
on the sidewalk, id. at 142:1-16, 146:4-12.

Luca testified that he didn't know whether the car hit
his right knee or his right waist, but that it hit the right
side of his body, and the pressure caused him to turn eastward.
Id. at 152:16-22. According to Luca's testimony, he was already
standing against the fence when the car hit him; the car did not

push him back, but it did pin him to the fence.  See, e.g., id. at 156:5-7 ("I think when he turned me, my left portion of my body was against the fence"); 158:1-8 ("Q: . . . you're walking, practically touching the fence, you're hugging the fence, the car strikes you on your right and basically turns you up against the fence that you were walking up against when it struck you? A: I believe so.  I don't remember getting forced back.").

Luca testified that as a result of the impact, "I was in severe pain . . . I thought that I was going to get cut in half.  I could hear the engine revving, and I think I saw smoke coming from the engine.  My legs felt that they were on fire, I started screaming in pain.'"  Luca Statement, Apr. 22, 2008, Def. MSJ Ex. M at 3.

Luca testified that immediately after feeling the car on him, "I'm like thinking that I could feel the heat from the car, I could smell the air bags, I reached for my gun and when I went straight down for it, it wasn't there.  It was further back, so I had to reach back to get it.  I got my gun out and I just started shooting."  Luca Dep., Def. Ex. M at 155:12-18. See also id. at 158:19-22 ("Q: And at the moment you are struck by the vehicle, you reach for your weapon; correct?  A: Yes."). Luca adamantly denied firing at the vehicle as it was moving

toward him: "I wanted you to understand that I wasn't -- I wanted you to understand that when I started firing, the car was already there. I don't want you to think that I was shooting the car as it was coming towards me." Id. at 166:18-22.

Other eyewitness testimony of the details of the shooting and of how the car allegedly pinned Luca to the fence paint a rather different picture.

Officer Wilson, for example, testified that the car was moving when the shooting began:

> [Mr. James]: So at this point you have a situation where you have a car that's at a complete stop; correct?
>
> [Wilson]: No. The car was traveling away from me at this point.
>
> Q: Okay. And what happens next?
>
> A: At that point I hear gunshots.
>
> Q: So, the car is traveling and you hear gunshots?
>
> A: Yes.
>
> Q: You see the car moving and you hear gunshots?
>
> A: Yes.

Wilson Dep., Def. MSJ Ex. L at 151:22-152:10.

By contrast, Officer Brian Williams said that the car was stopped when he first heard gunshots. Williams Dep., Def. MSJ Ex. P at 138:2-3.

Officer DeNofa reported in her testimony that the car was not moving when the gunshots were fired, and her account is largely incompatible with Wilson's and undermines Luca's. DeNofa recalls leaning into Campbell's car and trying to pull him out when the shooting started. She testified that she looked out through the windshield and saw Luca standing, pinned between the car and the gate. DeNofa did not see his legs crushed or Luca touching the car or anguish on his face. She also did not recall hearing Luca scream in pain. Pl. Resp. ¶ 113, DeNofa Dep., Pl. Resp. Ex. 1 at 148:11-16, 151:2-5, 158:2-22, 162:10-22.

But Officer Schlosser testified that he saw Luca lying across the hood of the car and screaming loudly in pain. Pl. Resp. ¶ 135, Schlosser Dep., July 16, 2010, Def. MSJ Ex. O at 116:15-117:12, 118:6-7. Schlosser's account of the impact of the car on Luca also differs from Luca's testimony: while Luca testified that he did not remember being forced back, Schlosser testified that the impact did not spin Luca, but instead

"push[ed] him" and "forced him right into the fence", id. at
117:20-22, 119:4-5.

Like Schlosser, Officer Ronald Scott -- who was in the
helicopter at the time of the incident -- testified that he saw
Luca bent over the hood of the car.  Pl. Resp. ¶ 156, Scott
Dep., Def. MSJ Ex. K at 143:8-10, 147:8-11.

### 2.  How Luca Was Unpinned

Luca testified that he did not recall hearing anything
while he was firing, and, when he stopped firing the next thing
he did was to extricate himself.  Luca also testified that he
did not remember the details of how he was freed from his
position between the car and the fence.  He testified that he
tried to make his way north and tried to get his legs out, Luca
Dep. at 183:3-12, and recalled that he lifted his right leg, id.
at 199:2-200:14.  Luca did not remember that any other police
officer helped him, but he said that Officer Kenyata Lee "was
right there.  When I stepped out of the car -- when I stepped
out from behind the car, he was -- I didn't have to go more than
a foot or so and then he grabbed me."  Id. at 201:18, 202:2-5.
In response to the question, "So, what you're saying is the way
you remember it, Officer Lee didn't do anything to help you get
unpinned?" Luca said, "No.  But he claims that he did, so I'm

sure that he probably did and I just don't remember or realized
it." Id. at 208:3-8.

The officers' eyewitness accounts of how Luca was
unpinned also diverge.

Officer Lee testified that he approached the car from
the direction of the driver's side after the shooting and saw
Luca pinned to the fence, closer to the passenger's side of the
Acura. According to Lee, no other officers were assisting Luca,
so Lee jumped over the hood of the Acura, grabbed Luca, and "got
him out" from between the car and the fence. Lee Dep., Pl.
Resp. Ex. 6 at 80:9-89:5-6.

Officer Williams's testimony also suggests that Luca
was removed quickly, as he recalled that

> The only time that I saw Officer Luca was
> when he was pinned up -- it looked like his
> left side, left leg was down a little lower.
> It looked like he was on a slant and he was
> pinned up against the fence in between the
> fence and the car and firing the weapon.
> That's the only time I saw him other than
> that and, like I stated, I tried to go
> around the passenger side, then I busted the
> window with my flashlight and then I looked
> up and I realized he wasn't there. And then
> a few moments later I was looking around and
> I saw him getting into the police vehicle.

Williams Dep., Def. Ex. P at 10:9-21.

Officer Forsythe described a more laborious process whereby Luca was removed by pushing the wrought iron fence farther back. In response to the question of how Officer Luca was unpinned, Forsythe explained that "unbelievably the fence breaks away and I believe that's how they can get him out. It wasn't easy getting him out from what I could see." Forsythe Dep., Pl. Resp. Ex. 4 at 112:12-18.[5]

    a.   Credibility Of Officers' Eyewitness Testimony

    1.   Inconsistent Eyewitness Statements

Plaintiff stresses that the officers' eyewitness accounts are inconsistent regarding which officers and how many of them tried to remove Campbell from the car before he allegedly pinned Luca to the fence.

Wilson testified that he and DeNofa were the first to arrive at the scene. According to Wilson, as he and DeNofa approached Campbell's car he walked along the driver's side while DeNofa walked in parallel along the passenger's side. Wilson walked up to the driver's side window and began speaking to Campbell, and he did not see DeNofa again until after the

---

[5] In the same deposition Forsythe conceded that the belief that the fence was pushed back to free Luca was "an assumption", Forsythe Dep. at 112:21-24. Forsythe did not qualify his statement that from his observation it wasn't easy to remove Luca.

shooting.  Wilson Dep., Def. MSJ Ex. L at 100:9-13, 114:15-
116:3, 160:19-161:1.

Wilson recalled that he was talking to Campbell
through the driver's side window when Campbell reached down to
put the car in reverse, and so Wilson leaned through the window
to grab Campbell's arms.  Id. at 115:21-116:19.  Wilson did not
reach Campbell's arm in time to stop him from putting the car
into reverse.  Id. at 120:7-11.  Campbell returned his right
hand to the steering wheel and Wilson held both arms.  Id. at
124:2-14.  According to Wilson, Campbell then began to back up,
and he drove about fifteen feet in reverse while Wilson held on
to his arms.  Id. at 124:15-18.  Campbell then, in Wilson's
account, stopped the car and struggled to release his arms from
Wilson's grip without removing his hands from the steering
wheel.  Id. at 125:7-18.  Campbell then pulled his right arm out
of Wilson's grasp and put the car in drive.  He accelerated,
turning the car to the right, toward the fence, and Wilson lost
his grip and moved away from the car.  Id. at 128:15-16, 134:14-
136:17.

DeNofa's testimony differs.  According to DeNofa, as
she and Wilson approached the car she initially walked to the
passenger's side, but, finding the passenger's side door locked

and the window rolled up, she walked around behind the Acura and joined Wilson at the driver's side window. DeNofa Dep. at 108:23-109:22, 122:10-125:24. DeNofa recalled that Wilson was holding both of Campbell's arms, and DeNofa -- who was standing on Wilson's right side -- also grabbed Campbell's arms. Id. at 127:5-128:2. DeNofa described a struggle in which she and Wilson both tried unsuccessfully to remove Campbell's hands from the steering wheel, and she testified that this ended when Wilson "banged into" her, causing him to fall backward out of the car. Id. at 140:23-141:4, 144:12-145:1.

DeNofa testified that after Wilson fell out from the car, she "looked back into the car and then [] heard gunshots." Id. at 148:4-5. During her deposition on January 13, 2010, DeNofa did not mention the car moving in reverse. Indeed, she testified that she had no recollection of the car moving at all while she was holding Campbell's arms, id. at 150:8-16. DeNofa conceded that although on August 21, 2006 she had stated that the car did accelerate toward the fence, she could not say at her January 13, 2010 deposition whether the car had in fact accelerated, id. at 173:3-174:21.

Other officers' testimony are also contradictory on the question of who tried to remove Campbell before the

24

shooting.  Williams testified that he was also at the driver's
side window trying to remove Campbell, and that he was standing
next to Officer Michael Trask and one other officer.  Williams
Dep., Jan. 6, 2010, Def. MSJ Ex. P at 101:20-103:14.  Trask, on
the other hand, said he did not approach the car until after the
shooting started.  Trask Statement, Aug. 21, 2006, Def. MSJ Ex.
U.  Officer John Boyle said that when Luca was struck, Boyle
observed only two police officers -- including Luca -- on the
scene -- Luca toward the passenger's side and the other officer
on the driver's side of Campbell's car.  Boyle Dep., Pl. Resp.
Ex. 3 at 157:3-158:24.

Testimony regarding whether Campbell's wheels were
spinning after Luca was pinned to the fence also differs.
Costanzo had no recollection of the tires spinning after the car
struck Luca, Costanzo July 19, 2010 Dep., Def. MSJ Ex. N at
198:14-200:17, while Trask, Schlosser, and Forsythe recalled the
wheels spinning, see Trask Statement, Aug. 21, 2006, Def. MSJ
Ex. U; Schlosser Statement, Apr. 28, 2008, Def. MSJ Ex. O;
Forsythe Statement, Aug. 22, 2006, Pl. Resp. Ex. 5.

###        2.   Contradictions Between Eyewitness
           Statements And Physical Evidence

Schlosser recalled that he saw Luca pinned against the fence and heard the engine of the Acura revving and its tires spinning. Schlosser Statement, Apr. 22, 2008, Def. MSJ Ex. O at 3. Schlosser remembered that he heard gunshots before he drew his firearm and that he then drew his gun, discharged it once, "waited a second and then discharged it again because the car was still revving and the tires were spinning." Id. Forsythe also testified that he saw the rear driver's side tire spin as the vehicle struck Luca. Forsythe Statement, Aug. 22, 2006, Pl. Resp. Ex. 5.

Plaintiff points out that this testimony is inconsistent with the physical evidence. After examining the car and the scene of the accident, Dr. Harper concluded,

> There is no physical evidence of the rear wheels spinning either on the sidewalk, nor in the street. This would be impossible because the 2002 Acura CL is a front-wheel drive vehicle. Similarly there is no evidence of the front wheels spinning with associated tire scuff marks near the front wheels.

Report of Dr. Harper, Def. MSJ Ex. T at 28.[6]

_____
[6] As we will discuss, physical evidence suggests that Campbell became paralyzed during the shooting, which creates another

3.   Evidence of Campbell's
                         Resistance After He Was Shot

        Plaintiff also contends that "testimony of Campbell's

continued resistance after he was shot 22 times was fabricated

to enhance the claim that he was trying to injure police

officers, and posed a continuing threat."  Pl. Resp. at 32.

        Forsythe testified that after the shooting Campbell

was "[k]icking, throwing punches, screaming, telling us to get

off of him", Forsythe Dep., Pl. Resp. Ex. 4 at 110:17-18, and

that when Campbell's legs were out of the car, Forsythe saw him

kicking.  Id. at 111:8-9.  Plaintiff argues that this account

cannot withstand Dr. Harper's conclusion reached after analyzing

Campbell's autopsy report: "Two of the projectiles from shots

11-15 entered the 10th thoracic vertebrae and produced

maceration of the underlying spinal cord which would result in

immediate paralysis of his legs."  Report of Dr. Harper, Def.

MSJ Ex. T at 12.

_____

reason to question whether the engine was revving and the wheels
were spinning when the later shots were fired.

B.   Analysis

    1.   Analyzing A Claim Of Qualified
        Immunity To Suit Under § 1983

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme

Court mandated a two-step process for addressing claims of

qualified immunity:

> A court required to rule upon the qualified
> immunity issue must consider . . . this
> threshold question: Taken in the light most
> favorable to the party asserting the injury,
> do the facts alleged show the officer's
> conduct violated a constitutional right?
> This must be the initial inquiry. . . . if a
> violation could be made out on a favorable
> view of the parties' submissions, the next,
> sequential step is to ask whether the right
> was clearly established.

Id. at 201.

But in Pearson v. Callahan, 555 U.S. 223 (2009), the

Supreme Court backtracked and held that this process should be

optional and "should not be regarded as an inflexible

requirement", id. at 227.  The Supreme Court explained that

"though [the Saucier sequence] should no longer be regarded as

mandatory", it "is often beneficial", id. at 236.  We use this

sequence to guide our analysis here, turning first to the

question of whether plaintiff has alleged facts sufficient to

sustain a claim of a violation of Campbell's Fourth Amendment

rights.

2.  Excessive Use Of Force

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures."  It is well-settled that apprehension using deadly force constitutes a seizure of Fourth Amendment moment, see, e.g., Tennessee v. Garner, 471 U.S. 1, 7 (1985), and so the question is whether the seizure here was reasonable.  See, e.g., Lamont v. New Jersey, 637 F.3d 177, 182-83 (3d Cir. 2011) ("[t]o prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances").

A determination of whether a seizure is reasonable requires "careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake," and this assessment demands "attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396 (internal citations omitted). We assess the reasonableness of an officer's use of force "from

29

the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. This is an objective inquiry. Id. at 397.

The Supreme Court has held that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." Garner, 471 U.S. at 11. But "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Id. As our Court of Appeals has interpreted Garner's analysis, "deadly force must be necessary to prevent escape and the fleeing suspect must pose 'a significant threat of death or serious physical injury to the officer or others", Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999) (quoting Garner, 1471 U.S. at 3).

Here, plaintiff argues that Schlosser and Luca's use of force was unreasonable. Plaintiff contends that the evidence shows that "Luca was not pinned by the vehicle when he initiated the shooting, and that the car was not revving it[s] engine, spinning its wheels and/or accelerating at the time Campbell was shot by Luca and Schlosser." Pl. Resp. at 28. Plaintiff argues

that under this scenario, "at the time of the shooting, Campbell did not pose an immediate threat to Luca or any other person, and the use of deadly force was unreasonable under the Fourth Amendment." Id.

The defendants do not rely on the threat Campbell posed to Luca to justify the reasonableness of the use of deadly force here. Instead, in their motion for summary judgment defendants argue that deadly force was warranted because of the threat Campbell posed to others -- as evinced by his wild driving earlier that night. The defendants contend that Campbell had engaged in "reckless and life threatening behavior in the minutes prior to arriving in the 3200 block of Belgrade Street by driving his automobile at high speeds, on a sidewalk, disregarding traffic controls and causing a motor vehicle accident from which he fled and which resulted in serious bodily injury". Def. MSJ at 25. They argue that "Campbell's vehicle had been lawfully stopped by police four times but he unlawfully fled", and so "[t]here is simply no way to explain why Campbell drove away from the police four times, and up on to the sidewalk of Belgrade Street, except that Campbell intended to continue his life threatening driving rampage." Id.

We must draw all inferences in favor of the nonmoving party and determine whether there is a genuine issue of material fact as to the reasonableness of the use of deadly force. Thus, our inquiry is whether there is a genuine dispute that, at the time he was shot, Campbell posed "a significant threat of death or serious physical injury to the officer or others", Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999).

We are mindful that in considering allegations of an unreasonable seizure when the police have used deadly force,

> a court should avoid simply accepting what
> may be a selfserving account by the
> officers. It must also look at the
> circumstantial evidence that, if believed,
> would tend to discredit the police officers'
> story, and consider whether this evidence
> could convince a rational fact finder that
> the officers acted unreasonably.

Lamont, 637 F.3d at 182 (internal quotations and citations omitted).

a. Threat To Luca

There seems little doubt that plaintiff has shown a genuine dispute as to whether Campbell posed a significant threat of death or serious injury to Luca when the shooting began. Plaintiff has identified evidence of a bullet entering the car from straight on and of a cluster of bullets entering

from the passenger's side.  Dr. Harper concluded from this physical evidence that Luca could not have been pinned to the fence when he fired into the hood, and he finds that the evidence suggests instead that Luca shot into the car from the front and then moved to "the side of the car somewhere near the front wheel well on the passenger side", where he "fired 17 additional shots."  Report of Dr. Harper, Def. MSJ Ex. T at 29. Dr. Harper argues that in addition to the angles of the bullet holes, "[t]he distribution of shell casings also place Officer Luca on the passenger side of the car and not in front of the car when he fired the shots into the windshield."  Id.

The contradiction between the officers' testimony that Luca was pinned to the fence and the physical evidence as Dr. Harper has analyzed it also raises a genuine dispute as to the material fact of whether Luca was pinned between the Acura and the fence during the shooting, and thus whether Campbell posed a danger of death or serious physical harm to Luca.

The contradictions in the officers' testimony that plaintiff has identified further undermine the claim that Campbell posed a danger to Luca because he had pinned Luca to the fence.  These contradictions raise questions of the witnesses' credibility that preclude disposition at the summary

judgment phase.  See, e.g., Ettinger v. Johnson, 556 F.2d 692,

697 (3d Cir. 1977) (internal quotations omitted) ("the court

should not resolve a genuine issue of credibility at the hearing

on the motion for summary judgment").

But even if there is a dispute as to whether Campbell

posed a threat to Luca, the officers' use of deadly force might

still have been reasonable were there no genuine dispute that

Campbell posed a risk of death or serious physical injury to

others at the time of the shooting.

### b.   Threat To Others

The defendants argue that "Campbell drove away from

the police four times, and up onto the sidewalk of Belgrade

Street" because he "intended to continue his life threatening

driving rampage."  Def. MSJ at 25.  Putting aside the question

of Campbell's intent, these facts are undisputed.

But the question is not whether Campbell intended to

continue driving recklessly through Philadelphia when he pulled

onto the curb at Belgrade Street.  Rather, the question is

whether it objectively appeared that he could have continued --

because only if it so appeared could the officers reasonably

have probable cause to believe that he posed a threat of death

or serious bodily harm to others.  For this inquiry, we must

consider Campbell's capacity to continue driving -- both when the shooting began and after the shots were fired.

The facts present a genuine dispute as to whether Campbell could have continued to drive through the fence or whether the fence stopped the Acura.  The defendants do not address this argument, but one assumes they would presumably contend that Campbell could have driven through the fence and did not because after he pinned Luca the shooting began, preventing him from continuing.

But taking all the facts in a light most favorable to the non-movant and if Luca was never pinned to the fence we can reasonably infer that the fence stopped the Acura from moving forward.  In his report analyzing the physical evidence, Dr. Harper found a "green paint transfer along the entire edge of the bumper" of the Acura, "indicating that the bumper had traveled along the fence pole the entire length of the bumper and then rebounded approximately 5-6 inches."  Dr. Harper found "no indication that the car continued to travel forward beyond the length of the bumper after it struck the fence."  Report of Dr. Harper, Def. Ex. T at 19.  On these facts, a jury could reasonably find that the fence had immobilized Campbell and

rendered him non-dangerous to the public in a way that the officers could have readily recognized.

The reasoning of our Court of Appeals in Abraham v. Raso, 183 F.3d 279 (3d Cir. 1999) fortifies our assessment here. In Abraham, the Court overturned the district court's grant of summary judgment where a security guard had shot an intoxicated suspect as he allegedly drove toward her. The Court found that there was a genuine dispute as to the danger the suspect posed to the public, and thus the reasonableness of the security guard's use of deadly force:

> [T]he undisputed facts are that [the decedent] had stolen some clothing, resisted arrest, hit or bumped into a car, and was reasonably believed to be intoxicated [as he attempted to drive away]. Given these facts, a jury could quite reasonably conclude that [the decedent] did not pose a risk of death or serious bodily injury to others and that [the guard] could not reasonably believe that he did.

Id. at 293.

Yet we need not find that a genuine dispute exists as to whether Campbell posed a danger of death or serious bodily injury to others when the shooting began. Even if Campbell did pose such a risk, summary judgment on the excessive force claim would be inappropriate in light of Lamont where our Court of

Appeals made clear that an initially reasonable use of deadly force may later become unreasonable.

In <u>Lamont</u>, state troopers were pursuing a car-jacking suspect who was driving down a highway at 10:00 p.m. when he pulled to the side of the road and ran into the woods.  The troopers pursued him into the woods and ordered him to put his hands up and surrender.  The suspect ignored their commands and tried to run away but became caught in a thicket.  <u>Lamont</u>, 637 F.3d at 179-80.  The troopers again demanded that he raise his hands, and the suspect quickly removed one hand from waistband "not as if he were surrendering, but quickly and as if he were drawing a pistol." <u>Id.</u> at 180.  The officers opened fire and continued to shoot after the suspect turned away.  The troopers fired a total of thirty-nine rounds.  Eleven of the eighteen bullets that struck the suspect hit him from behind.  <u>Id.</u>

The Court of Appeals found that though the troopers were justified in opening fire when the suspect removed his hand from his waistband, <u>id.</u> at 183, there was "a triable issue on whether the troopers' continued use of force, even if initially justified, became excessive as the events unfolded." <u>Id.</u> at 184.  The Court explained that "[e]ven where an officer is initially justified in using force, he may not continue to use

37

such force after it has become evident that the threat

justifying the force has vanished." <u>Id.</u>

Here, the officers fired twenty-two shots at Campbell,

<u>see</u> Internal Affairs Division Police Shooting Report, Def. MSJ

Ex. G.  The physical evidence suggests that his legs were likely

paralyzed after the fifteenth shot.  Report of Dr. Harper, Def.

Ex. T at 12.  This paralysis would have rendered Campbell

incapable of driving and thus of posing a danger to others.  We

recognize that this scenario differs from the situation the

officers faced in <u>Lamont</u>.  Officers can readily see a suspect

turning away from them while they might not perceive the

paralysis of a suspect sitting in a car.  But <u>Lamont</u>'s holding -

- that force justified by a threat of danger at the beginning of

an encounter is no longer justified when the threat vanishes --

prevents us from finding as a matter of law that defendants' use

of force here was not excessive.  For example, if Campbell was

paralyzed and could not accelerate, it may be that the wheels,

had they been spinning, would have stopped, rendering further

use of deadly force unreasonable.

Luca testified that immediately before the shooting he

was suffering from tunnel vision, Luca Dep., Def. MSJ Ex. M at

131:23-132:8.  He testified that he didn't recall seeing the car

coming toward him, but only recalled feeling the car hit his leg, reaching for his gun, and firing.  Id. at 146:4-7, 174:7-20.  He discharged all of the shells in his weapon, and while he was firing he didn't hear anything.  Id. at 176:22-177:9.  When the gun was fully discharged, Luca recalled that "everything seemed to come to a stop."  Id. at 174:7-20.  This testimony, in light of Campbell's likely paralysis, creates a genuine dispute as to whether a reasonable officer in Luca's position would have continued to use deadly force until his gun's ammunition was spent -- thus preventing summary judgment on the excessive force claim against Luca.

The evidence shows that Schlosser fired far fewer shots than Luca did, see Internal Affairs Division Police Shooting Report, Def. MSJ Ex. G (showing that Luca fired eighteen shots but Schlosser fired only two).  Schlosser said that he fired a second time because "the car was still revving and the tires were spinning", Schlosser Statement, Apr. 22, 2008, Def. MSJ Ex. O at 3.  Because plaintiff has raised a genuine dispute about the facts of whether the tires were spinning and the engine was revving by pointing to physical evidence that contradicts Schlosser's statement, we find that a

genuine dispute exists as to the reasonableness of Schlosser's use of force and precludes summary judgment on the issue.

Though we by no means minimize the pressures police face in scenarios involving deadly force, we also must heed the admonition of our Court of Appeals: "a court ruling on summary judgment in a deadly-force case 'should be cautious . . . to 'ensure that the officer[s are] not taking advantage of the fact that the witness most likely to contradict their story -- the person shot dead -- is unable to testify,'" Lamont, 637 F.3d at 181-82 (quoting Abraham v. Raso, 183 F.3d 279, 294 (3d Cir. 1999) (alterations and further internal quotations omitted).

### 3. Qualified Immunity

The defendants next argue that even if they did use excessive force they are entitled to qualified immunity. Def. MSJ at 26. Qualified immunity protects government officials from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotations omitted). See also, e.g., Donahue v. Gavin, 280 F.3d 371, 377 (3d Cir. 2002); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). As the Supreme Court has explained, "[q]ualified immunity balances two important

interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson, 555 U.S. at 231.

Since qualified immunity means immunity from suit, the Supreme Court has instructed that in order to give the protection full effect the question of immunity should be decided, if at all possible, before trial.  See id., 555 U.S. at 237 ("Qualified immunity is 'an immunity from suit rather than a mere defense to liability'") (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)); Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995) (internal citations omitted) ("Because the qualified immunity doctrine provides the official with immunity from suit, not simply trial, the district court should resolve any immunity question at the earliest possible stage of the litigation").

Moreover, in the Third Circuit whether an official should receive qualified immunity is a question of law that the court, rather than a jury, must resolve.  Curley v. Klem, 499 F.3d 199, 211 (3d Cir. 2007).  But the legal determination as to qualified immunity sometimes depends on the resolution of predicate facts.  As our Court of Appeals has explained, where

the facts are disputed "our precedent makes clear that such [factual] disputes must be resolved by a jury after a trial." Id. at 208. Curley conceded that "in such cases the immunity becomes no more than a mere defense", id., but the panel found this result inherent in the mixed questions of law and fact involved in an immunity defense. Id.

Summary judgment on qualified immunity is inappropriate if "a reasonable jury could find that the unlawfulness of [defendants'] actions was so 'apparent' that no reasonable [actor in defendants' position] could have believed his actions were lawful." Lee v. Mihalich, 847 F.2d 66, 69 (3d Cir. 1988) (quoting Martin v. Malhoyt, 830 F.2d 237, 253-54 (D.C. Cir. 1987)). Whether a jury could find the unlawfulness of Schlosser and Luca's actions so apparent that no reasonable police officer in their situation could have believed the actions lawful depends on the resolution of genuine factual disputes. For example, the answer might be different if the jury finds that Luca was pinned to the fence than if it were to find that he was not, or different if the jury finds that the wheels were spinning when the car was against the fence rather than if it were to find that they were not.

The right this plaintiff asserts -- a suspect's right to be free from deadly force unless an officer reasonably believes he poses a threat of serious bodily injury to himself or others -- is certainly well-established. See, e.g., Lamont v. New Jersey, 637 F.3d 177, 185 (3d Cir. 2011) (finding this right "clearly well-established" because "[i]t has long been the law that an officer may not use deadly force against a suspect unless the officer reasonably believes that the suspect poses a threat of serious bodily injury to the officer or others"). Thus, depending on the resolution of these factual disputes, we could find that the officers were entitled to qualified immunity.

III.   Count IV - Claim Against The City
       Of Philadelphia Pursuant To 42 U.S.C. § 1983

In Count IV of his complaint, plaintiff described five policies or customs that he alleged gave rise to municipal liability under § 1983. But in his response in opposition to the motion for summary judgment plaintiff addressed only two bases for municipal liability: (1) a lack of planning by officers at the scene, and (2) the City's alleged failure to train officers adequately for car stops. See Pl. Resp. ¶¶ 79-102, pp. 23-27.

First, plaintiff appears to contend that the City is liable because of the lack of plan that the officers had at the scene. He relies on the opinion of Dr. R. Paul McCauley, a Professor of Criminology at Indiana University of Pennsylvania. Based on his review of the incident, Dr. McCauley concluded that

> [A] felony car stop and other high-risk car
> stops require planning and cautious action
> to deploy the officers and to deal with
> problems, such as refusal to exit the
> vehicle. The lack of planning in this case
> led to too many officers being at the scene
> . . . the deficient tactics created this
> very dangerous situation that resulted in
> the use of deadly force.

Pl. Resp. at 26. Thus, plaintiff appears to argue that the lack of plan here constitutes a basis for municipal liability.

Next, plaintiff seems to argue that the City is liable for a failure to train officers in traffic stops. He cites what he regards as two shortcomings of officer training. First, plaintiff contends that the City has failed to train officers for situations in which the driver does not respond to officers' commands and, second, that the City has failed to provide training for stops that are neither routine nor felony stops.

In support of the contention that officers received no training for how to deal with non-compliant drivers, plaintiff concedes that the officers all "received training in the police

academy in making regular car stops for violations of the Motor
Vehicle Code and felony car stops," id. at 24.  But plaintiff
notes that one officer testified that there was "NO training for
situations where the subject of the car stop does not comply
with verbal commands", and "[n]one of the other officers, except
Williams, articulated any training for situations of non-
compliance by the occupant of the stopped car."  Id. at 25.

        In arguing that the officers did not receive training
for non-felony, non-routine traffic stops, plaintiff points to
Dr. McCauley's assessment that "The PPD has Felony /Car Stop
procedures and training but officers are unskilled and uncertain
what to do in high-risk stops that may or may not be felony
suspects."  Id. at 26 (quoting McCauley Report, Def. MSJ Ex. S
at 6).  Plaintiff argues that because "vehicle stops that are
not simple traffic stops are a recurring situation that face
Philadelphia police officers every day", id., "the need for
adequate training is so obvious" that "the lack of training in
this case constituted a policy of the municipality under
Monell."  Id. at 27.

        Plaintiff argues that to the extent officers did
receive training appropriate to the stop here, "that training
was totally ignored by every responding officer", id.,

"render[ing] that training meaningless." Id. at 25. According
to plaintiff, "Exposure to information in a training session
does not mean anything more than that a person was exposed to
the information. Training implies learning and understanding
that information which then provides skills. The deposition
testimony in this case, established a complete lack of real
training." Id.

Because the lack of plan and failure to train theories
are the only municipal liability claims for which plaintiff has
opposed the motion for summary judgment with citations to the
record, it is only these bases for such liability that we will
now consider.

## A.    Factual Background

In support of the municipal liability claims, the
plaintiff highlights what he contends constitute two
shortcomings regarding traffic stop training in the City of
Philadelphia.

### 1.    Lack of Plan

Plaintiff points to several officers' statements that
they did not have a plan when they arrived at the scene on
August 21, 2006. Wilson and DeNofa both testified that they did

not have a plan that they discussed when they arrived.  Wilson
Dep. at 101:17-19; DeNofa Dep. at 107:19-23.  Williams and his
partner, Mary Powell, also testified that they did not have a
plan.  Williams Jan. 6, 2010 Dep. at 58:21-59:9; Powell Dep.,
Pl. Resp. Ex. 2a at 97:20-98:6.  Boyle also did not recall
forming a plan with Forsythe, his partner, Boyle Dep. at 133:7-
13, and Forsythe testified that they did not have a plan when
they arrived, Forsythe Dep. at 65:19-21.  Schlosser and his
partner did not form a plan, Schlosser July 16, 2010 Dep. at
42:1-9, nor did Luca and his partner, Costanzo, Luca Dep. at
112:19-24; Costanzo Apr. 22, 2010 Dep. at 22:11-19.

      Plaintiff contrasts this lack of planning with the
planning Dr. McCauley recommended.  Dr. McCauley observed that
"PO Costanzo and PO Luca had no plan as what they were going to
do and no officer on-site assumed the role of officer-in-charge
. . .  Likewise, the radio transcripts do not indicate any radio
transmissions directing PO Luca, any officers, what the plan is
. . . ."  McCauley Report, Def. MSJ Ex. S at 8-9.  Dr. McCauley
opined that the International Association of Chiefs of Police
(IACP) Model Policy states that "a vehicle felony stop [and
other high-risk traffic stop operations] [] requires planning
and cautious action by the arresting police officer", id. at 9

(quoting IACP) (alteration in original).  According to Dr.
McCauley, an officer in charge should have been on the scene and
"should have had Officers Costanzo and Luca do nothing".  Id.
Dr. McCauley then suggests that "The officers [sic] plan should
have been to block or immobilize the suspect vehicle, not stand
in front or approach it from the front."  Id.  He concludes that
the "deficient tactics", including the lack of plan, "created
this dangerous situation requiring a split-second decision to
use deadly force."  Id.

## 2.   Training Regarding Traffic Stops

The City notes, and the plaintiff does not dispute,
that the Philadelphia Police Department issued and had in effect
at the time of the incident Directives 10 and 22 regarding the
discharge of firearms by police personnel and the use of force,
respectively.  Def. MSJ Ex. A ¶¶ 56-58.

Moreover, the City accurately observes that Dr.
McCauley found no deficiency with either Directive 10 or
Directive 22.  In fact, Dr. McCauley conceded that "[t]he
[Philadelphia Police Department] has Felony Car Stop procedures
and training".  McCauley Report, Def. MSJ Ex. S at 6.[7]

---

[7] Dr. McCauley did find that, despite these procedures, "officers
are unskilled and uncertain what to do in high-risk stops that
may or may not be felony suspects." Id. at 6.  We discuss

Wilson testified during his deposition that he received training regarding regular car stops and felony car stops. Wilson Dep., Def. MSJ Ex. L at 62:1-5. According to this training, during a regular car stop the officer is to provide information to the police radio such as the tag number of the car and the number of occupants, and he is then to approach the stopped car on the driver's side, touch the trunk to make sure it is closed, and then stand behind the driver's window to speak with the driver. Id. at 62:11-23. In a felony car stop, the officer is trained to instruct the occupants to get out of the car, but the officer should not approach the vehicle. Id. at 63:2-6.

DeNofa also testified that she received the training at the Police Academy that during a felony car stop the officer is to use the police microphone to instruct the occupants to exit the car. DeNofa Dep., Pl. Resp. Ex. 1 at 31:14-18. According to DeNofa's testimony, the City trains officers to maintain safety during a felony car stop by taking cover behind the door of the police car. Id. at 36:6-23. DeNofa noted, "And that's how we're trained to do a felony car stop. Is that how it happens? Ninety percent of the time, no, because there are

concerns with the effectiveness of training, as opposed to the policies the City has established, below.

just too many variables and every car stop is different."  Id.
at 31:23-32:3.

Williams's testimony corroborates the other officers'
accounts of the training.  Williams testified that each stop is
"one of two car stops . . . that we classify.  It's either a
felony car stop for a felony violation . . . [or] a situation
where, you know, just basic traffic stop."  Williams Jan. 6,
2010 Dep., Def. MSJ Ex. P at 76:5-15.  Boyle agreed that there
were "two types of motor vehicle stops", "a motor vehicle
traffic violation type" and "a felony car stop", Boyle Dep., Pl.
Resp. Ex. 3 at 51:16-52:1.  Like DeNofa, Boyle testified that
according to the training, in "a felony car stop you . . . take
a tactical position behind it in your vehicle and use verbal
commands to have them exit the vehicle, showing their hands, and
[the officer] take[s] cover behind the police car."  Id. at
54:6-10.  Schlosser's testimony regarding protocol for felony
car stops was similar.  See Schlosser Dep., Apr. 27, 2010, Def.
MSJ Ex. O at 27:17-30:23.

Schlosser also testified that in a hypothetical felony
car stop in which the driver was armed, if the driver failed to
heed police commands "we would call for additional officers" and
"[a] supervisor would usually be called as well and we would

probably treat that situation . . . as like a barricade if

possible." Id. at 32:3-10. Schlosser described a barricade as

an approach in which the police are "trying just to contain that

person, leave them right where they are", id. at 32:20-22, and

he explained that a vehicle stopped at a red light would not be

considered a barricade situation because the light could change.

Id. at 35:22-36:4.

Schlosser offered the description of how he would

handle a situation involving a noncompliant driver in response

to a line of questions that suggested that the officers in fact

received training on how to handle scenarios in which drivers

didn't respond to verbal commands:

> [Mr. James]: . . . in that situation after
> you've given these various verbal commands,
> what if you're ignored? What if none of
> your commands are being met with positive
> responses?
>
> [Officer Schlosser]: It depends. There's
> different ways to attempt to handle that
> depending on the circumstances of course.
>
> Q: Just general protocol, what are you
> trained to do?
>
> A: If someone has a weapon in their car?
>
> Q: If someone has a weapon in the car --
>
> A: It's established that they have a weapon
> in the car?

> Q: I mean, that's what we're talking about,
> you know that they have a weapon in the car.
> You first said that you stay behind your
> door for protection, you give verbal
> commands, show us your hands, put your hands
> outside?
>
> A: Right. Okay, yes.
>
> Q: So now we're at step two where the
> person already has failed to listen to those
> commands. What's the next thing you do?
>
> A: At that point, again, generally, under
> those circumstances we would call for
> additional officers -- if the circumstances
> played out the way you said, we would
> already have in the area officers, I would
> hope at that point. A supervisor would
> usually be called as well and we would
> probably treat that situation, again, based
> on the circumstances, as like a barricade if
> possible.

Id. at 31:5-32:10. Without citing to the record, plaintiff also concedes that Williams referred to "training for situations of non-compliance by the occupant of the stopped car." Pl. Resp. at 25. DeNofa testified that "as far as [she could] remember", the Police Academy training "was limited to circumstances where the driver of the vehicle actually complies and gets out". DeNofa Dep. at 38:1-5.

Wilson testified that he received training for vehicular stops under Act 120 at the Police Academy, but he said that he did not believe he had received training on car stops

since then.  Wilson Dep. at 54:14-15, 55:12-16.  DeNofa also

testified that she did not receive yearly retraining updates on

defensive tactics.  Id. at 39:19-24.

Wilson recalled that he treated the stop of Campbell

as something between a routine car stop and a felony car stop,

though he said that he didn't receive any training about a type

of car stop besides routine or felony.  Wilson Dep. at 72:16-

74:18.  DeNofa testified that she approached the vehicle, DeNofa

Dep. at 121:1-15 -- an action inconsistent with the training for

felony stops that she herself described.  Williams testified

that this stop would fall "in between" the two types of stops

for which he was trained.  Wilson Dep. at 73:2-3.

B.  Analysis

1.  Lack of Plan

42 U.S.C. § 1983 does not impose respondeat superior

liability on municipal defendants.  Instead, a municipality is

liable under § 1983 only if its official policy or custom has

caused a deprivation of constitutional rights.  Monell v.

Department of Social Servs. of City of New York, 436 U.S. 658,

691-94 (1978); see also, e.g., Montgomery v. De Simone, 159 F.3d

120, 126 (3d Cir. 1998).

As our Court of Appeals has construed Monell, "[a] government policy or custom can be established in two ways." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990).  First, a policy exists where a "'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict."  Id. (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)).  Alternatively, a custom exists when a course of conduct "though not authorized by law . . . [is] 'so permanent and well settled' as to virtually constitute law." Id. (quoting Monell, 436 U.S. at 690).  In either case, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom."  Id.

Plaintiff does not explain how the lack of plan alleged here constitutes a municipal policy or custom.  He has pointed to no official policy nor has he demonstrated any other occasions on which the Philadelphia Police engaged in insufficient planning such that this approach could be fairly regarded as a custom.  Plaintiff has not even made this threshold showing let alone demonstrated that a policymaker is responsible for the lack of such planning.  Moreover, plaintiff

has not raised any specific objections to the policies that were in place.

Plaintiff therefore cannot sustain a claim against the City of Philadelphia based on the allegation that the Philadelphia police officers failed to plan here.

## 2.   Failure-To-Train Liability

A failure to train may give rise to § 1983 liability if it "reflects a 'deliberate' or 'conscious' choice by a municipality -- a 'policy' as defined by" cases in the Monell line of jurisprudence.  City of Canton, 489 U.S. 378, 389 (1989).  As our Court of Appeals has explained, "only when a municipality's failure to train is tainted by a deliberate indifference to constitutional rights can that failure rise to the level of a municipal policy", Simmons v. City of Philadelphia, 947 F.2d 1042, 1060 (3d Cir. 1991).  Thus, a municipality may be liable only if the failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact", De Simone, 159 F.3d at 127 (citing Canton, 489 U.S. at 388).  Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011) (quoting Board

of Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997)

(further internal quotations omitted)).

In order to show deliberate indifference in the

failure-to-train context, the Supreme Court has typically

required "[a] pattern of similar constitutional violations by

untrained employees", id. This is because "[p]olicymakers'

'continued adherence to an approach that they know or should

know has failed to prevent tortious conduct by employees may

establish the conscious disregard for the consequences of their

action.'" Id. (quoting Bryan City, 520 U.S. at 407).[8]

_____

[8] Our Court of Appeals has formulated the test as follows:

> [A] failure to train, discipline or control
> can only form the basis for section 1983
> municipal liability if the plaintiff can
> show both contemporaneous knowledge of the
> offending incident or knowledge of a prior
> pattern of similar incidents and
> circumstances under which the supervisor's
> actions or inaction could be found to have
> communicated a message of approval to the
> offending subordinate.

Montgomery v. De Simone, 159 F.3d 120, 127 (3d Cir. 1998).
Here, the plaintiff has not alleged contemporaneous knowledge of
the offending incident or knowledge of a prior pattern of
similar incidents. But because, as we discuss, the Supreme
Court has also raised the possibility of "single-incident
liability", we will address the applicability of such liability
here.

Canton did, however, leave the door open for "single-incident liability", or liability arising from a single injury caused by a failure to train. The Supreme Court posited:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

Canton, 489 U.S. at 390. By way of example, the Court explained,

> [C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights.

Id. at 390 n.10 (internal citations omitted).

But in Connick, the Supreme Court recently clarified the "narrow range of circumstances" in which "a pattern of similar violations might not be necessary to show deliberate

57

indifference." Connick, 131 S. Ct. at 1361 (internal quotations omitted). The Supreme Court explained that the Canton "single-incident liability" hypothetical assumes a complete lack of training: "The Canton hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force" and without training "utter[ly] lack [the] ability to cope with constitutional situations", id. at 1363.

Plaintiff here does not identify a pattern of instances -- or, indeed, any other instance -- in which the City's failure to train officers for non-routine, non-felony traffic stops led to constitutional violations. As the defendants correctly note, "there is no evidence in this record of prior similar incidents occurring." Def. MSJ at 22.

Instead, by suggesting that "where the need for adequate training is so obvious, the lack of training . . . constituted a policy of the municipality under Monell", Pl. Resp. at 27, plaintiff appears to argue for single-incident liability.

Plaintiff cannot sustain a claim of single-incident liability against the City because he has failed to demonstrate

causation.[9]  Whether a plaintiff alleges failure-to-train

liability based on a pattern of similar incidents or a single

incident, he must still demonstrate a causal link between the

deficiency in training and the constitutional injury.  See,

e.g., Canton, 489 U.S. at 391 (the plaintiff must identify a

specific deficiency in training that is "closely related to the

ultimate injury").

     As Canton explained, it is insufficient for a

plaintiff "to prove that an injury or accident could have been

avoided if an officer had had better or more training", instead,

he must demonstrate that the injury "[w]ould . . . have been

avoided had the employee been trained under a program that was

not deficient in the identified respect."  Id. (emphasis added).

---

[9] We note that the allegations regarding training here
differ in an important respect from the hypothetically-deficient
training the Supreme Court discussed in Canton.  While the
Canton hypothetical posited no training at all for officers
regarding the constitutional limits of force, here plaintiff
alleges that the training for traffic stops was deficient
because although the Philadelphia Police Department did provide
training in routine and felony traffic stops, it did not provide
training for "hybrid" stops such as the one plaintiff alleges
occurred here.  This categorical training, even if its
implementation required officers to adapt, differs from the
total lack of training Canton contemplated.  Nevertheless, we
need not reach the question of whether the lack of training
identified here could give rise to single-incident liability,
because, as we discuss above, plaintiff has failed to
demonstrate a causal link between training deficiencies and the
injury sufficient to sustain a claim against the City.

Plaintiff does not explain how training in non-routine, non-felony stops would have prevented the constitutional injury.[10]  Plaintiff suggests that the cause of Campbell's injury was Luca's decision to walk in front of the car.  Plaintiff relies on Dr. McCauley's assessment that "the deficient tactics created this very dangerous situation that resulted in the use of deadly force."  Pl. Resp. at 26 (quoting McCauley Report at 8-9).  But as the deposition testimony shows beyond any doubt, the officers <u>were</u> trained to approach the vehicle from behind.  <u>See, e.g.</u>, Williams Jan. 6, 2010 Dep., Def. MSJ Ex. P at 135:22-136:3 ("Yeah, yeah.  I had training [to] approach from the rear of the car.").  Plaintiff concedes as much in saying that, by walking in front of the car, Luca "violated his basic training as to staying out of harm's way even for a routine traffic stop", Pl. Resp. at 26.  Luca's decision to walk in front of the car was not based on a gap in training, but instead was a deviation from that training.

---

[10]  Indeed, Dr. McCauley's assessment undermines the argument that the injury would have been avoided had the officers been trained in non-routine, non-felony traffic stops. Dr. McCauley suggests that training in felony traffic stops would have sufficed here when he opines, "the involved officers were justified to consider this a felony/high-risk traffic stop and for officer safety [to] proceed with extreme caution", McCauley Report at 7.

The thrust of plaintiff's argument with regard to failure-to-train liability appears to be that the officers violated the very training they in fact received:

> [E]very officer violated the training that they did receive, so as to render that training meaningless. Exposure to information in a training session does not mean anything more than that a person was exposed to the information. Training implies learning and understanding that information which then provides skills. The deposition testimony in this case, established a complete lack of real training.

Pl. Resp. at 25.

But a police officer's non-compliance with training is an individual fault and does not demonstrate the requisite deliberate indifference needed to sustain a claim of municipal liability for failure to train. As the Supreme Court has explained, "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." Canton, 489 U.S. at 390-91. See also Pelzer v. City of Phila., 656 F. Supp. 2d 517, 536 (E.D. Pa. 2009) (emphasis in original) (quoting Simmons v. City of Phila., 947 F.2d 1042, 1060 (3d Cir. 1991) for the proposition that "A municipality's deliberately indifferent

failure to train is not established by (1) presenting evidence of the shortcomings of an individual").

Plaintiff's allegations can sustain individual claims, but they cannot here sustain a claim of municipal liability for failure to train.  As the Supreme Court recently held with respect to municipal liability, "we must adhere to a stringent standard of fault, lest municipal liability under § 1983 collapse into respondeat superior."  Connick, 131 S. Ct. at 1365 (internal citations omitted).  Officer DeNofa thus had it exactly right: "there are just too many variables and every car stop is different."  DeNofa Dep., Pl. Resp. Ex. 1 at 31:23-32:3. A municipality's training for such stops cannot conceivably canvass every possible variable that officers must confront every day.

IV.  Conclusion

We will therefore deny the defendants' motion for summary judgment as to Count I insofar as it relates to defendant Officers Luca and Schlosser.  We will grant defendants' motion for summary judgment with respect to Count IV, and we will grant as unopposed the defendants' motion for summary judgment with respect to all other claims.

BY THE COURT:

/s Stewart Dalzell, J.